Johnston *v.* Hyde.

JOHN TAYLOR JOHNSTON

*v.*

CHARLES HYDE.

Under the evidence,—*Held*, that the defendant had not, by acquiescence in the substitution of a small, wooden trunk for an open raceway, lost his right to have such open raceway maintained over complainant's lands, as reserved in his several grants; and that the court could not, without his consent, compel him to accept any covered conduit whatever in lieu of the original, open one.

Bill for injunction and cross-bill. On final hearing on pleadings and proofs. Submission on briefs of counsel.

*Mr. B. Williamson*, for complainant.

*Mr. C. Parker*, for defendant.

THE CHANCELLOR.

The complainant and defendant are respectively the owners of adjoining tracts of land in Plainfield. On that

NOTE.—In *Merritt* v. *Parker*, *Coxe 460, 466*, an action for *increasing* the quantity of water, Kinsey, C. J., said: "No one has a right to compel another to have his property improved in a particular manner; it is as illegal to force him to receive a benefit as to submit to an injury." Also, *Tillotson* v. *Smith*, *32 N. H. 90*.

In *Hulme* v. *Shreve*, *3 Gr. Ch. 116*, a person entitled to an easement by the natural flowage of water, was granted an injunction to restrain the construction of an artificial substitute, although the

Johnston *v.* Hyde.

of the former, which contains .more than 100 acres in its enclosure, his dwelling-house (his country residence) stands, and on that of the latter is an ancient mill.   The complainant's property was conveyed to him in .or about the year 1864, and since that year he has been in the actual possession and occupation of it.   When he bought it, there was an artificial water-course (a raceway) running through it, and the mill on the defendant's premises was then in use as such.   In or about 1872, the complainant substituted for the raceway a wooden box or trunk, of the dimensions of one foot and three inches in height, two feet and eight inches in width, and of the length of one thousand and sixty ·feet, or thereabouts, with a fall of about five inches, nearly in the·bed of the raceway, and filled in with earth around it, and covered the place with sod.   Over part of it he built a macadamized road from his house to his stables.   In 1874, the defendant entered upon the complainant's land and attempted to raise the gate which the complainant had placed at the mouth of the trunk near the dam.   He was forbidden to do so by the complainant, who denied his right to come on his land, but the defendant.persisted in his purpose of raising the gate.   Immediately after that transaction, the original bill was filed for an injunction restraining him from entering upon the complainant's premises for the purpose of interfering with the trunk or interfering with the complainant's premises for any such purpose, or in any

defendants alleged (*p. 125*) that such substitution would be a decided benefit to complainants.

In *Dewey* v. *Bellows, 9 N. H. 282,* a defendant was held liable for increasing the size of a flume, although it was more advantageous to the plaintiff.

In *Dickerson* v. *Grand Junction Canal Co., 15 Beav. 260,* on a motion for an injunction for the violation of a covenant as to the joint use of waters, it was held to be no answer, to say that the alterations would not be injurious, or even to prove that they were beneficial to the complainants; and see *S. C., 7 Exch. 281; 3 Pars. on Cont. \*218.*

In *Jewett* v. *Whitney, 43 Me. 242,* the defendant entered on plaintiff's lands, and with the connivance of his co-tenants, tore down plaintiff's mill, which was almost worthless, and erected another mill, worth $2,000, in its place.—*Held,* that plaintiff was entitled to recover, not only the lands and mill, but nominal damages for the trespass.—REP.

way disturbing the complainant in the enjoyment of his premises. On the filing of the bill an injunction was granted, which was subsequently modified (*Johnston* v. *Hyde, 10 C. E. Gr. 454*) so as to permit the defendant to enter upon the complainant's premises for the purpose of raising, and, if necessary, of removing that gate and any other obstruction to the flow of the water which, subsequently to the filing of the bill, had been, or at any time thereafter might be, placed or constructed therein. The defendant having answered the bill, filed a cross-bill for a decree establishing his right to the easement of an open raceway through the complainant's premises leading from the pond thereon to the defendant's mill, and to the maintenance of the pond and the dam thereto, so that the water in the pond may be of the same height at which it was on the 8th day of May, 1824, and the raceway of the same depth and width it was at that date, and that the trunk may be declared to be a nuisance to him, and may be abated, and the raceway restored to the condition in which it was at that date, and that Mr. Johnston may be perpetually enjoined from continuing, by means of the trunk, the gate therein, or otherwise, any obstruction to the full and free enjoyment by Mr. Hyde of the raceway, or from preventing him from going on the property of Mr. Johnston to repair or clean out the raceway or abate any nuisance, accidental or otherwise, to his rights in the premises, or to prevent any obstruction to his enjoyment of the easement.

The complainant's property appears to have been made up of several tracts conveyed to him by different persons. One of the tracts, the one lying next to the defendant's land on which his mill stands, was conveyed by the defendant to the complainant on or about July 1st, 1872, and contains about three and one-half acres. The deed from the defendant to the complainant for it contains the following reservation: "Excepting and reserving to the party of the first part, his heirs and assigns, the right of the raceway, as now opened, leading to the pond below, with all necessary rights

to enter upon said premises along the line of the same for the purpose of cleaning it out and keeping it in repair, as heretofore granted." The next tract adjoins that land on the northeast, and is part of a tract of land conveyed by Lewis M. Force to Zachariah Webster, in 1835, of which the tract of three and one-half acres above mentioned was also part. The deed from Force to Webster contains the following reservation: " The said Lewis M. Force reserves the width of thirty feet across the said lot above conveyed, where the race now runs, nine chains and five links in length, and forty-five and a half links in width, for the use of his mill, with the full privilege of ingress, egress and regress to and from the same; to amend, repair and keep in order the said mill-race running across the same, unto the said Lewis M. Force, his heirs and assigns forever, as long as the same may be used and occupied by the said Lewis M. Force, his heirs and assigns." When, in 1835, Force conveyed to Webster, the former was the owner of the defendant's mill. He derived his title from Eden S. Webster, by deed dated October 27th, 1834, which conveyed to him a tract of 41.93 acres, including the tract above mentioned conveyed in 1835 by Force to Zachariah Webster. By that deed Eden S. Webster conveyed to Force, with the land, the privilege of keeping the dam the same height as it then was on the lands of Daniel Shotwell, on the northeasterly side of the property conveyed, to raise the water for the use of the mill. Eden S. Webster obtained his title to that property and privilege by sundry mesne conveyances from Elijah Shotwell, who obtained the privilege from Daniel Shotwell. Elijah owned the land which afterwards became the property of Lewis M. Force, adjoining the property of Daniel. By deed dated May 8th, 1824, Daniel conveyed to Elijah half of the dam and pond on his land, with half of the water and water privileges thereto belonging, situate on Green brook, for the purpose of a saw-mill erected on Elijah's land, as it then stood; the dam to be raised no higher than it then was, without the consent

of the parties. By deed of the same date, Elijah conveyed
to Daniel half of the saw-mill and race, together with half
of the water privileges and water-courses belonging to the
saw-mill on Elijah's land (the defendant's mill), with the
privilege of a walk on the race-bank to the saw-mill from
the dam erected for the saw-mill as it then stood; the dam
to be raised no higher than it then was, without the consent
of the parties, and the race to be and remain as it then
stood. Elijah and Daniel thus became owners in common
of the water privileges, including the pond, dam and race-
way, and also of the mill. The contiguous lands were in
the several ownership of each. June 23d, 1824, Daniel
conveyed his right in the mill and privileges to William P.
Shotwell, who, by deed dated December 10th, 1825, con-
veyed the same right to Elijah, who thus became the owner
of the mill in severalty, and of the water privileges before
mentioned, including the dam, pond and raceway. The
property of Daniel Shotwell, on which the pond and dam
were, appears to have passed, by sundry mesne conveyances,
to the complainant, who holds it subject to the before-men-
tioned privileges granted by Daniel Shotwell. It was con-
veyed by Daniel Shotwell to Job Squier; by him to David
W. Wetmore; by him to Edgar Harriott; by him to Cyrus
Townsend; by Townsend to Maria E. R. Berckmans, who,
with her husband, conveyed it to John W. Craig, who con-
veyed it to the complainant. The deeds from Squier to Wet-
more (May 30th, 1843), from Wetmore to Harriott (January
29th, 1845), and from Harriott to Townsend (March 16th,
1848), were made expressly subject to the right and privi-
lege of a raceway on the premises, as it existed in Force,
his heirs and assigns, leading to his mill.

The evidence fully establishes the right of the defendant
to the easement of the artificial water-course which he
claims. Indeed, the existence of the right is substantially
admitted by the complainant. No question on that head is
made in the brief submitted in his behalf. He relies on
the defence that the defendant abandoned the right, or, if

Johnston v. Hyde.

he did not abandon it, that he is bound by acquiescence to accept the provision of the trunk, or some similar subterraneous one, for the transmission of the water from the pond on the complainant's property to the defendant's mill. But there is no proof of abandonment, though there is proof of non-user for about a year. And even this, according to Mr. Hyde's testimony, occurred merely from his inability to get proper tenants for the mill. He testifies that, although the mill was not in operation during that period, the water was kept in the pond until a short time before Mr. Johnston made his improvements (in which he substituted the box culvert or trunk for the raceway), and then it was let out. He testifies, also, that after those improvements were made, the mill was in use as such whenever there was a flow of water, and that since that time it has been of but little use, because of the deprivation of the water from the substitution of the trunk for the race. That Mr. Johnston knew that Mr. Hyde had not abandoned the right to the raceway, but insisted upon it, appears from his own testimony. He says that he had a conversation with Mr. Hyde, before he put in the box, on the subject of substituting a wooden box for the open raceway, and that the latter said it would require a box six feet square. Mr. Hyde swears that the first intimation he had from Mr. Johnston of his wish to make any alteration in the raceway through his premises, was a request on the part of Mr. Johnston, in the summer of 1872, to substitute for it iron pipes, of about one foot in diameter, to be laid deep under the ground; and he says he told Mr. Johnston that such pipes would be of no manner of use to him, and that he could not, under any circumstances, consent to the substitution. He says that he added that a box six feet square would admit water enough to drive his mill, but that that method of carrying the water would not be practicable, because of the difficulty of cleaning the aqueduct; and he referred to an instance, within his knowledge, in which, for that reason, a wooden aqueduct, which had been put down as

30

a substitute for an open raceway, had been found imprac-
ticable. He swears that he told Mr. Johnston then that the
raceway was none too large as it was, and that he objected
to the covering of the raceway. He further says, that his
right to the raceway was not in any way disputed, and that
when the interview closed, he understood that the proposi-
tion for the substitution of an enclosed aqueduct for the race-
way was to be abandoned. He swears that in that conver-
sation, he gave Mr. Johnston to understand that he intended
to make "large use" of his mill. According to his testi-
mony, the next occurrence, in order of time, on the subject,
was his seeing some boxes, two feet eight inches wide,
ready to be laid at a road (Farragut road) which had been
laid out over Mr. Johnston's property. He says he spoke
about them to the carpenter who had them in charge, and
that the latter brought to him the following letter from Mr.
Johnston to him, dated November 12th, 1872:

"The surveyors of Somerset county have prepared a wooden culvert,
three feet wide, to be placed in the Hotchkiss raceway (the raceway
in question) where it crosses Farragut road. It is understood and
agreed between us that, by suffering this to be done, you are to lose
no legal rights to the present width of raceway, and that in case of
your finding the flow of water insufficient, you shall have the same
rights as now to require the enlargement of the same. It is not the
intention of this paper to give any rights, but only to guard against
the loss of any that now exist."

Mr. Hyde swears that the next knowledge he had on the
subject was that the boxes had been put in and covered up,
from Farragut road northward, across Mr. Johnston's prop-
erty to the dam, and that they were all in place under
ground and ready to be covered up from the road to his
mill. He also distinctly and expressly swears that he had
no notice or knowledge of the operation of laying the boxes
by Mr. Johnston north of the road, and none of their being
put down on the other side of the road, nearest to his prop-
erty, until they were being placed there. He was not using
the mill at the time, and relied on the letter just mentioned

for his protection, although he says he knew the boxes were too small.

The question of abandonment, as well as that of acquiescence, is set at rest by Mr. Johnston's answer to the cross-bill. It contains the following statement:

"This defendant, further answering, admits that, on or about the 1st day of November, 1872, he entered upon a certain alteration upon his said premises, and in and about the said raceway and dam; that he planned and proposed covering over the said raceway, and in the place thereof to substitute iron pipes, placed under the ground, and which he proposed to put at a depth which, as he said, he thought, and did think, would assist the flow of the said water; that he applied to the complainant for permission so to do; that the complainant did not agree with him, and did not wish the pipes put there, and this defendant, not wishing to have any difficulty, abandoned the plan; that this defendant having then expended a large sum of money in the improvement of the said property, and in beautifying the same, by the means and use of the water in the pond and brook on his said premises, and proposing to make other large expenditures in the same direction and for the same purpose, and the said artificial raceway being unsightly, and from the use then made of the water and the change in its use from what it had theretofore been, making it entirely unnecessary to have the artificial raceway an open raceway, this defendant determined, by a wooden culvert sufficiently large for the purpose of carrying all the water that was then running through the artificial channel, or had run there since this defendant had been the owner of the premises, to substitute the same through his premises from the pond to Farragut road, in the place of the open raceway, which said Farragut road, although upon this defendant's premises, and laid over them by this defendant's consent, was laid out by the public authorities according to law."

The answer also states that the letter was written because of Mr. Hyde's objections. It appears, then, that the box was substituted for the open raceway, against Mr. Hyde's will. No acquiescence can be imputed to the latter under such circumstances, but, on the other hand, Mr. Johnston must be held to have acted at his peril.

It is proved that, after the box was put in, in 1872, Mr. Hyde received from Mr. Johnston two keys to a gate on the premises of the latter, so that he and his employes might

have access to the raceway gate at the dam. In the summer of 1874, Mr. Hyde commenced to improve his mill, and spent about $600 on it in so doing. While the improvements were in progress, he passed in and out of Mr. Johnston's premises, to and from the raceway gate, and let the water in and out to suit his convenience, in reference to the improvements which he was making. When the improvements were completed, Mr. Johnston's foreman called on him and asked if the box would admit water enough to drive the mill, to which he replied that it would not, and immediately after that the raceway gate at the dam was closed and nailed up. Mr. Hyde entered upon Mr. Johnston's premises to open the gate, and was ordered away by Mr. Johnston himself, who denied his right to be there. The assertion by Mr. Hyde of his right led to this suit. Mr. Hyde testifies that about one-half of the water which runs through the culvert goes through openings into two ornamental ponds, one belonging to Mr. Johnston and the other to Mr. Hotchkiss. That the effect of the substitution has been exceedingly injurious to Mr. Hyde, is beyond question. It appears that not one-twentieth part of the water which would flow to his mill by the open raceway, passes to it by the culvert.

The evidence fails to establish consent or tacit acquiescence on Mr. Hyde's part in the action of Mr. Johnston. There is no evidence that he has ever yielded up any of his rights to the water, but, on the other hand, he appears to have asserted all of them. In this connection it is noteworthy that the deed from him to Mr. Johnston reserves, as before stated, to him, his heirs and assigns, the right of the raceway as then opened, leading to the pond below, with all necessary rights to enter upon the premises along the line of the raceway, for the purpose of cleaning it out and keeping it in repair, as theretofore granted. Not only is this an assertion of the right, but it is a recognition of it by Mr. Johnston. The deed is dated July 1st, 1872, but a few months before the wooden boxes were laid.

Johnston *v.* Hyde.

It is urged, in behalf of Mr. Johnston, that arrangements to which Mr. Hyde was a party, in regard to the water below his mill, indicate an intention not to insist upon his rights to the water for the use of his mill. But those arrangements have no reference to, nor do they affect, Mr. Hyde's rights, so far as Mr. Johnston is concerned.

It is further urged that the public improvements which have been made (referring to Farragut road), forbid his claim; but, in the first place, that improvement constitutes no impediment to the fullest enjoyment of his rights, and, in the next place, the culvert under that road was laid under the guaranty of Mr. Johnston's letter, that Mr. Hyde's omission to oppose it should not be construed to affect his utmost right. Mr. Johnston declares himself willing to put down, through his grounds, a culvert of such dimensions as the court shall direct. But without the consent of Mr. Hyde, and in the absence of any estoppel by acquiescence, the court cannot compel him to accept the substitution of a covered aqueduct for an open raceway. Besides, it may be remarked, in order to make a substitution of a larger culvert for that which has been laid, it would be necessary to take up the latter, and so Mr. Johnston would be subjected to the very injury complained of as irreparable, and which caused him to have recourse to this court for a remedy, by injunction, and which alone justified the action of this court in enjoining Mr. Hyde.

The dam on Mr. Johnston's property appears to be of the proper height. The raceway, according to the testimony on the part of Mr. Hyde (there is none on the part of Mr. Johnston, except his own, as to its dimensions, and he merely says it was a wide, open raceway), was about fourteen or fifteen feet wide at the top and about nine feet at the bottom. It will be established at fourteen feet at the top and nine feet at the bottom.

There will be a decree in accordance with the views above expressed.